## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |
|---|---|
| ASYMMETRIC IP LLC,<br><br>Plaintiff,<br><br>v.<br><br>SITECORE USA, INC.,<br><br>Defendant. | Civil Action No. 2:23-cv-00111<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement in which Plaintiff, Asymmetric IP LLC ("Asymmetric"), makes the following allegations against Defendant Sitecore USA, Inc. ("Defendant" or "Sitecore"):

### THE PARTIES

1.       Plaintiff Asymmetric is a Texas limited liability company having its principal place of business at 1401 Lavaca Street #748, Austin, Texas 78701.

2.       On information and belief, Defendant Sitecore is a Delaware corporation having its principal place of business at 101 California Street, 16th Floor, San Francisco, California 94111. On information and belief, Sitecore is a wholly owned subsidiary of Sitecore Holding II A/S, a Danish limited liability company ("Sitecore Holding"). On information and belief, Sitecore is Sitecore Holding's U.S. operating subsidiary and a substantial portion of Sitecore's activities in the U.S. are performed under the direction and control of Sitecore Holding.

### NATURE OF THE ACTION

3.       This is a civil action for the infringement of United States Patent No. 9,047,261 B2

("the '261 patent" or "the Patent-in-Suit") under the Patent Laws of the United States 35 U.S.C. § 1 *et seq.*

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, including 35 U.S.C. § 271, *et seq.*

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b) because Defendant has a regular and established place of business in this District, including at 7700 Windrose Avenue, Plano, Texas 75024, and, on information and belief, has committed acts of patent infringement within this District giving rise to this action.

6.      On information and belief, Defendant is subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Texas Long Arm Statute, due at least to its substantial business in this forum, including (i) at least a portion of the infringements alleged herein; and (ii) directly and/or through subsidiaries or intermediaries, regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in Texas and in this District.

## THE PATENT-IN-SUIT

7.      On June 2, 2015, the '261 patent, titled "Document Editing Method," was duly and lawfully issued by the U.S. Patent and Trademark Office ("USPTO").  A true and correct copy of the '261 patent is attached hereto as Exhibit A.

8.      The '261 patent involves a novel way to edit a webpage.



FIG. 4

*See*, *e.g.*, (Ex. A, the '261 Pat., FIG. 4.)

9.      Asymmetric owns the '261 patent and holds the right to sue and recover damages for infringement thereof, including past infringement.

10.      The '261 patent is valid, enforceable, and, as of its priority date, the inventions claimed involved more than well understood, routine, and conventional activities.

11.      During the prosecution of the '261 patent, the USPTO cited Colligan et al.; *Special Edition Using Microsoft Office FrontPage 2003*; 2004; Que Publishing; pages 50-91, 276-290, and 621-640 ("Colligan") as prior art.  In particular, the "split view" option found in FrontPage as depicted below:



66 | CHAPTER 3 FRONTPAGE'S VIEWS

(*Id.* at 66.)

12.     Several years after the release of FrontPage 2003, in December of 2006, Microsoft described an improved version of the "split view" design in a patent application that was later cited in the '261 patent prosecution—now published as U.S. Patent No. 7,802,179 B2.



(*Id.* at Fig. 1.)

13.     As of 2008, the Microsoft FrontPage "split view" design was still cutting edge as shown in U.S. 2009/0235186 A1 from Microsoft Corporation ("Limited-Scope Rendering Patent Application").



(*Id*. at Fig. 4.)

14.     In the Limited-Scope Rendering Patent Application, Microsoft improved the "split view" design found in Colligan by adding a zooming feature.  (*Id*. at Fig. 5.)  This "zoomed split view" feature was Microsoft's attempt to improve webpage editing and tackle some of the very same challenges described in the '261 patent specification.  (*Id*.)  However, despite improving the way users edit webpages, including through the use of two distinct display areas, many challenges remained that Microsoft did not address.  For example, Microsoft's "zoomed split view" still required a user to have specialized knowledge of code.  Likewise, the structure of Microsoft's design required the use of proprietary software—and was not easily accessible for use in a variety of web browsers.

15.     Microsoft's "zoomed split view" deviated from the inventions described in the '261 patent because, for example, its design did not require the processing and rendering of code twice.

Microsoft's "zoomed split view" was created for seasoned computer programmers who wanted to see the raw html code.  It would have been counterintuitive for Microsoft to deploy the '261 patented design based on their targeted customers at the time.  It was over a decade after the priority date of the Limited-Scope Rendering Patent Application before Microsoft, a current licensee of the '261 patent, finally implemented the '261 patent design structure.



*See, e.g.*, (Microsoft Digital Marketing Center, "My website" builder tool, available, after logging in, at https://www.microsoft.com/en-us/digital-marketing-center.)

16.     Microsoft's "zoomed split view" was not its only attempt to improve webpage editing software.  Around the same time as the '261 patent priority date, Microsoft filed for another patent, U.S. Patent No. 8,181,106 B2 ("Microsoft Template Patent"), to address similar concerns discussed in the '261 patent.  The Microsoft Template Patent described the use of overriding templates to facilitate editing a webpage—as well as restricting a user's editing authority.  For example, the Microsoft Template Patent limited editors to "customizable web parts," making clear "[n]ot all parts of the web page are customizable."  (*Id.* at col. 5:12; Fig. 7.)  Although perhaps a structural improvement, including in terms of overall webpage uniformity, the Microsoft Template

Patent still relied on the same webpage editor found in the Limited-Scope Rendering Patent Application—employing a separate "designer view," where the "web page appears as it would on a client system web browser," as well as a self-explanatory "code view." (*Id*. at col. 4:19-24.) The only improvement in terms of the user interface over the Limited-Scope Rendering Patent Application involved a data view, where "web parts are generally displayed in tabular form." (*Id*.) The Microsoft Template Patent also called for the webpage to be "rendered on a server from shared templates and displayed on the web-page editor on the client system." (*Id*. at col. 2:10-12.) Accordingly, the Microsoft Template Patent required the use of specialized server software (and a compatible client web-page editor) and could not be executed on a diverse selection of web browsers.

17.     In 2010, Microsoft, obviously a well-known pioneer in the field of webpage editor software, continued innovating by next attempting to address a "loss of contextual continuity" for its users in web applications—the same goal described in the '261 patent specification. Over a year past the priority date of the '261 patent, Microsoft filed for a patent on the use of dialog boxes to help determine "which control elements to display in a limited viewing space" and to preserve "task flow for users." (U.S. Patent No. 8,856,672 B2 at col. 1:30-33.) Specifically, Microsoft launched web-based dialog boxes without a page refresh to "provide users a seamless experience in managing their documents through a web application without loss of context." (*Id*. at col. 1:48-51.) Microsoft determined that using a conventional system, or locally installed applications, "not only consume[s] resources, but [locally installed applications] also present the challenge of each user's machine having to be set up initially, maintained with hardware and software upgrades, debugged individually in case of problems, etc." (*Id*. at col. 1:48-51.) Microsoft was still struggling, however, to find the perfect solution to address the loss of contextual continuity, noting

that "[i]f the user performs multiple tasks successively such as editing the document, viewing it, then editing more, and viewing again, a new dialog may be opened each time." (*Id*. at col. 3:49-51.) One of Microsoft's proposed solutions was for a dialog box to be "presented within the original web page with portions of the web page hidden, thereby providing a continuity of context without distracting the user with elements of the original web page." (*Id*. at col. 6:55-59.) This is not the solution Microsoft ultimately deployed over a decade later when they launched a Digital Marketing Center website creation service using the '261 patented design.

18.    Microsoft made clear in 2011 that solving the challenges addressed in the '261 patent could not be accomplished with well understood, routine, and conventional activities. Years after the '261 patent priority date, in what is now U.S. Patent No. 10,565,296 B2, Microsoft said "[i]t is a considerable challenge to provide a static HTML developer using a static HTML authoring tool with options for providing dynamically rendered web templates for use in a CMS." (*Id*. at col. 1:58-62.) Microsoft's newest idea was to build upon their "split view" architecture previously disclosed by adding a snippets gallery "provided as a browser-accessible service served by a web server." (*Id*. at col. 4:12-13.) Four sections for updating code were now offered, including "a Preview section 206, an Information section 208, a Snippet section 210, and a Customization section 212." (*Id*. at col. 4:21-23.) "Preview section," however, only offered "an approximate preview of the configurable control as it would be displayed in a webpage that is built on a web template that includes the configurable control." Accordingly, Microsoft's updated editor design did not produce a true representation of the webpage for the user—and still required specialized knowledge of computer code.



FIG. 2

(*Id*. at col. 4:24-27; Fig 2.)

19.    All the "split view" Microsoft improvements proposed above required specialized knowledge of computer code to achieve the desired result.

20.    In contrast, the '261 patent specification explains that "[b]y editing the document itself, and not for example code for rendering the document, the editor does not require specialist knowledge of code associated with the document."  (Ex. A, the '261 Pat., col. 2:12-15.)  This "is advantageous, especially for editing complex documents such as a webpage which include multiple types of document content, and which therefore are associated with code which is complex to edit."  (*Id*. at col. 2:15-18.)  The prior art, including FrontPage (which is specifically mentioned in the '261 patent specification), discloses rendering (not just viewing) a document for display in only a single display area (*e.g.*, the "Design view" panel).  The disadvantages of the FrontPage approach and design (and those that followed) are apparent from the illustrations discussed above.  Equally apparent are the advantages found in Fig. 4 of the '261 patent specification:



*FIG. 4*

(Ex. A, the '261 Pat., FIG. 4.)

21.     As just one simple example, in the prior art above, it was often necessary to submit the edited webpage code to a server for publishing just to preview changes, which is time-consuming and onerous.  The '261 patent described and claimed a solution to this problem.  (*Id.*)

22.     So called "what you see is what you get" (WYSIWYG) software improved the webpage editing experience—but failed to solve some of the most frustrating editing challenges. For example, WYSIWYG software allowed an editor to edit a marked-up version of the webpage rendered by the code; however, by showing the mark-up, the editor did not see a true representation of the webpage.  The mark-up also interfered with the positioning of elements of the webpage, which resulted in an inaccurate representation.  By editing the webpage, rather than the code, WYSIWYG editors also generated excess and unnecessary code.  The '261 patent specification addressed all these issues using more than well understood, routine, and conventional activities.

23.     Prior art database driven editing techniques also fell flat.  Using this method, a website editor stored portions of the webpage separately in a database.  Upon publishing, the separate portions of the webpage were combined.  This technique allowed an editor to

independently update distinct portions of a webpage.  Although offering some server efficiencies, this method meant an editor would update a portion of a webpage in a vacuum—devoid of crucial surrounding content.

24.    To overcome other deficiencies found in the prior art, the '261 patent specification describes how a user can simultaneously view two display areas.  "An editor can therefore edit part of the document in the second display area, and view the edited part of document in the first display area at the same time, without having to switch between different areas for editing the document and for viewing the edited document."  (*Id*. at col. 2:23-28.)  Further improvements involve displaying webpage edits in a first display area during the editing process.  "The editing may therefore be seen whilst the document is being edited" and, accordingly, "the editor can see if an edit changes the document in the second display area detrimentally, for example by disrupting a layout of the document."  (*Id*. at col. 2:31-35.)  In prior art systems, the editing was made and then subsequently previewed, which can be time consuming and iterative.  Simultaneously displaying the webpage edits in one display area while making the edits in another display area, as claimed in the '261 patent, allows for significant advantages over the prior art.

25.    By using the webpage editing methods claimed in the '261 patent, a dedicated area of the display offers an editor a true representation of the webpage being edited without mark-up. "This aids an editor to make accurate edits simply and efficiently, compared with prior art methods where an editor would need to preview the edited document without mark-up after having made edits; if the previewed document is not satisfactory, the editor may need iteratively to re-edit the document using mark-up and then preview the re-edited document again, until the desired edited document is obtained."  (*Id*. at col. 2:64-3:4.)

26.    A webpage editor can achieve further advantages over the prior art using the

methods claimed in the '261 patent by displaying an edited part of a webpage in his or her document viewing application of choice, thus achieving an application specific webpage layout. "For a document, such as a webpage, which is publicly available and accessed by numerous viewers, this is especially an advantage since it allows the editor to ensure that the edited document has a desired content and layout for public viewers to see." (*Id*. at col. 3:14-20.) "This ensures that regardless of the application used to view the edited document, the layout and content is acceptably presented." (*Id*. at col. 3:27-30.)

27. The methods claimed in the '261 patent also describe providing a second display area in response to an editor's input. "In this way, the second display area may be generated upon demand, for example when an editor identifies and selects a part of the document displayed in the first display area for editing." (*Id*. at col. 3:41-44.) When editing is completed, the second display area may be closed or hidden "to allow for enlarging the first display area so as to display more of the document therein." (*Id*. at col. 3:55-57.)

28. Often a webpage editor is tasked with updating an entire website—rather than a single webpage. By deploying the methods claimed in the '261 patent an editor can access additional webpages within the same website from the display area that contains webpage browsing capabilities. "Thus, an editor can navigate the website by browsing to different web pages via the first display area, and edit web pages as desired." (*Id*. at col. 6:41-43.)

29. The methods claimed in the '261 patent also describe how to generate modified data to allow a webpage to be enabled for editing. "For example, if the document is a webpage, code representative of the webpage may be processed to add functionality for editing the webpage" and therefore "a webpage viewer, having editing permissions, may access the enabled webpage and edit the webpage in accordance with the present invention, using the added functionality." (*Id*.

at 51-57.)

30.    The '261 patent specification describes a myriad of advantages over prior art systems using techniques that involve more than well understood, routine, and conventional activities.

## **SITECORE'S ACTS OF '261 PATENT INFRINGEMENT**

31.    Asymmetric restates and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

32.    In June of 2022, Sitecore redesigned its Moosend software to improve its Campaign Editor, Landing Page Designer, and Form Designer ("Moosend Design Software" or "MDS").



*See, e.g.*, (Moosend Website (last visited March 2023), available at

https://help.moosend.com/hc/en-us/articles/7112351827858-What-s-new-in-Moosend.)

33.    Sitecore uses MDS for editing documents and in particular webpages.



*See, e.g.*, (Moosend Website (last visited March 2023), available at

https://moosend.com/landing-pages/.)

34.    MDS receives mark-up language data associated with a user's document.   For

example, after a user creates a landing page using MDS, the user can update his or her landing

page via the MDS user interface.



*See, e.g.*, (YouTube, "Moosend Tutorial Full Step-By-Step Email Marketing Automation," (last visited March 2023), available at https://www.youtube.com/watch?v=VmAdGfwzhD4.)

35.    MDS processes the received mark-up language data to render at least part of the document for display in the center display area where the rendering includes formatting the document based on the received mark-up language data.  (*See, e.g.*, *Id.*)

36.    MDS then processes the received mark-up language data to render part of the document for display on the righthand side of the display area where the rendering includes formatting the document based on the received mark-up language data.  (*See, e.g.*, *Id.*)

37.    MDS further receives editing data from the user via the MDS user interface on the righthand side of the display area.



*See, e.g.*, (YouTube, "Moosend Tutorial Full Step-By-Step Email Marketing Automation," (last visited March 2023), available at https://www.youtube.com/watch?v=VmAdGfwzhD4.)

38.    MDS uses the received editing data to edit the righthand side of the display area while applying these edits to the center display area.  (*See, e.g.*, *Id.*)

39.    MDS also stores data associated with each edited version—allowing users to "undo" or "redo" changes.

## Undo or redo a change

To undo or redo a change:

1. On the top menu, click ⬋ You can undo as many changes as you want.
2. To redo an undone change, click ⬊ You can redo up to 20 of your last design actions. The redo icon disables when you make a new action or change.

*See, e.g.*, (Moosend Website (last visited March 2023), available at

https://help.moosend.com/hc/en-us/articles/4408486901394.)

40.    MDS subsequently receives further editing data from the user via the MDS user interface on the righthand side of the display area.



*See, e.g.*, (YouTube, "Moosend Tutorial Full Step-By-Step Email Marketing Automation," (last visited March 2023), available at https://www.youtube.com/watch?v=VmAdGfwzhD4.)

41.    MDS uses the further editing data to further edit the righthand side of the display area while applying these further edits to the center display area—as well as allowing users to simultaneously display the center and righthand display areas and display edits on the center display area during editing.  (*See, e.g.*, *Id.*)

42.    MDS also allows users to simultaneously show both display areas, including displaying the editing on the center display area while making the edits on the righthand side of the display area via the MDS user interface.  (*See, e.g.*, *Id.*)

43.    MDS also allows users to display at least part of the document in the display area without mark-up indicative of editing.



*See, e.g.*, (YouTube, "Moosend Tutorial Full Step-By-Step Email Marketing Automation," (last visited March 2023), available at https://www.youtube.com/watch?v=VmAdGfwzhD4.)

44.    MDS also offers users the choice to display an edited part of the document in the display area in accordance with a selected document viewing application like, for example, Chrome, Safari, Firefox and/or Edge.



*See, e.g.*, (YouTube, "Moosend Tutorial Full Step-By-Step Email Marketing Automation," (last

visited March 2023), available at https://www.youtube.com/watch?v=VmAdGfwzhD4.)

45.    MDS also allows users to transmit data associated with an edited document to a server.



*See, e.g.*, (YouTube, "Moosend Tutorial Full Step-By-Step Email Marketing Automation," (last visited March 2023), available at https://www.youtube.com/watch?v=VmAdGfwzhD4.)

46.    MDS further allows users to access a second display area in response to a user's input or hide the righthand display area.





*See, e.g.*, (YouTube, "Moosend Tutorial Full Step-By-Step Email Marketing Automation," (last

visited March 2023), available at https://www.youtube.com/watch?v=VmAdGfwzhD4.)

47.    MDS users can also toggle between versions as well as select and display in the

center display area a first edited version.

**Undo or redo a change**

To undo or redo a change:

1. On the top menu, click ⟲. You can undo as many changes as you want.
2. To redo an undone change, click ⟳. You can redo up to 20 of your last design actions. The
   redo icon disables when you make a new action or change.

*See, e.g.*, (Moosend Website (last visited March 2023), available at

https://help.moosend.com/hc/en-us/articles/4408486901394.)

48.    MDS also processes data and generates modified data for providing editing of a

document.



*See, e.g.*, (YouTube, "Moosend Tutorial Full Step-By-Step Email Marketing Automation," (last visited March 2023), available at https://www.youtube.com/watch?v=VmAdGfwzhD4.)

## COUNT ONE: INFRINGEMENT OF THE '261 PATENT

49.     Asymmetric restates and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

50.     The '261 patent is valid and enforceable under United States Patent Laws.

51.     The claims of the '261 patent are directed to a software design tool for updating webpages and involve more than the performance of well-understood, routine and conventional activities previously known.

52.     Defendant has been and is presently directly infringing at least claims 1-11, 16, 23 and 26-29 of the '261 patent under 35 U.S.C. § 271(a) as described in detail above, literally and/or under the doctrine of equivalents, by using and operating the Moosend Design Software as described in detail above which infringes at least claims 1-11, 16, 23 and 26-29 of the '261 patent.

53.     Defendant has been and is presently indirectly infringing at least claims 1-11, 16, 23 and 26-29 of the '261 patent under 35 U.S.C. § 271(b), literally and/or under the doctrine of

equivalents, by actively, knowingly, and intentionally inducing others (*e.g.,* Defendant's customers, distributors, partners, technical vendors, and/or third parties) to use or operate the Moosend Design Software which infringes as described in detail above at least claims 1-11, 16, 23 and 26-29 of the '261 patent, by, among other things, providing the Moosend Design Software for download and offering technical assistance relating to installation, use, operation, and maintenance.

54.    By letter and e-mail dated October 24, 2022 (receipt confirmed October 31, 2022), Defendant has been aware of the '261 patent and Asymmetric's allegations of infringement.

55.    Since Defendant has been on notice of the '261 patent, Defendant has been and is presently actively, knowingly, and intentionally inducing infringement as described in detail above of at least claims 1-11, 16, 23 and 26-29 of the '261 patent by encouraging others (*e.g.,* Defendant's customers, distributors, partners, and/or third parties) to use or operate the Moosend Design Software, knowing of the '261 patent, knowing that others will use and/or operate the Moosend Design Software in an infringing manner, and knowing and intending to encourage and facilitate those infringing uses and/or operations of the Moosend Design Software through the creation and/or dissemination of promotional and marketing materials.

56.    To date, on information and belief, Defendant has not provided its customers and/or users of the Moosend Design Software instructions on how to avoid infringement since Defendant had notice of the '261 patent.  On information and belief, Defendant continues to disseminate the same promotional and marketing materials as before.

57.    To date, on information and belief, Defendant has not produced or relied upon an opinion of counsel related to the '261 patent.

58.    On information and belief, through Defendant's policies or practices of not

investigating whether its products and services infringe the patents of others, Defendant intentionally took steps to avoid learning the extent of its infringement of the '261 patent.

59.     Defendant's infringement has been and/or continues to be willful and deliberate, entitling Asymmetric to additional damages.  Defendant has engaged in reckless conduct despite an objectively high likelihood that its actions constituted infringement of a valid patent.

60.     Asymmetric has been and/or continues to be damaged by Defendant's infringement of the '261 patent.

## PRAYER FOR RELIEF

**WHEREFORE**, Asymmetric respectfully requests that this Court enter judgment against Defendant as follows:

a)  adjudging that the Defendant has infringed, literally or under the doctrine of equivalents, the Patent-in-Suit;

b)  adjudging that Defendant's infringement of the Patent-in-Suit is willful;

c)  awarding Asymmetric the damages to which it is entitled under 35 U.S.C. § 284 for Defendant's infringement, trebled for willful infringement;

d)  adjudging that this case is exceptional under 35 U.S.C. § 285 and awarding Asymmetric attorneys' fees, costs, and expenses that it incurs in prosecuting this action;

e)  awarding Asymmetric pre-judgment and post-judgment interest on its damages; and

f)  awarding Asymmetric such other and further relief in law or equity that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Asymmetric hereby respectfully demands a trial by jury on all claims and issues so triable.

Dated: March 13, 2023

Respectfully submitted,

By: */s/ Eric H. Findlay*
    Eric H. Findlay
    State Bar No. 00789886
    Brian Craft
    State Bar No. 04972020
    FINDLAY CRAFT, P.C.
    7270 Crosswater Avenue, Suite B
    Tyler, Texas 75703
    Tel: (903) 534-1100
    Fax: (903) 534-1137
    Email: efindlay@findlaycraft.com
    Email: bcraft@findlaycraft.com

    Bradford J. Black
    Texas Bar No. 24086243
    BRADFORD BLACK P.C.
    500 W. 2nd Street, Ste. 1900
    Austin, TX 78701
    Email: bblack@bradfordblack.com
    Tel: (415) 813-6210
    Fax: (415) 813-6222

    **ATTORNEYS FOR PLAINTIFF**